UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 24-cr-160 (TSC) |
| v. : | |
| : | |
| LEAH EVA GREEN : | |
| a/k/a LEAH GRUPPO, : | |
| : | |
| **Defendant** : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Leah Eva Green has pleaded guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and a violation of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in any Capitol building) (Count Two). For the reasons set forth herein, the government requests that this Court sentence Leah Eva Green to 14 days imprisonment on Count One and 36 months of probation on Count Two. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

**I.      Introduction**

Defendant Leah Eva Green, a 27-year-old contractor in sales and marketing, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the

1

peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Green pleaded guilty to violations of 40 U.S.C § 5104(e)(2)(D) and (G). The government's recommendation is supported by the defendant's (1) watching police trying to clear the Upper West Terrace; (2) nonetheless entering the Capitol Building through the Senate Wing Door with her husband Leonard Gruppo and his friend Kenneth Kelly,[2] ignoring the smashed out windows and blaring alarm; (3) spending seven minutes inside the Building, with officers directing Green to leave at least twice; (4) subsequent deletion of the videos she took inside; and (5) false statements during her post-plea interview, evidencing a lack of true remorse for her conduct.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Green's crime support a sentence of 14 days incarceration in this case.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[2] *United States v. Kenneth Kelly*, 21-CR-331 (CKK) (D.D.C.); *United States v. Leonard Gruppo*, 21-CR-391 (BAH) (D.D.C.).

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 7 (Statement of Offense or "SOO") at ¶¶ 1–7.

*Defendant Green's Role in the January 6, 2021 Attack on the Capitol*

Green traveled with her husband, Leonard Gruppo ("Gruppo"), from New Mexico to Washington, D.C.—arriving on or about January 3, 2021—to attend the Stop the Steal rally. In Washington, Green and Gruppo met up with Gruppo's friend and former colleague, Kenneth Kelly ("Kelly"). SOO ¶ 8. *See* Image 1.



*Image 1: Green (yellow) next to her husband, Gruppo (blue) in Washington, D.C.*

Green, Gruppo, and Kelly attended former President Trump's speech on the National Mall. When it ended, Green, Gruppo, and Kelly walked from the Ellipse toward the U.S. Capitol. They

arrived on Capitol grounds about one-and-a-half to two hours before ultimately entering the Capitol Building. After making it to the Upper West Terrace, Green became briefly separated from Gruppo and Kelly. At approximately 2:49 p.m., a line of police in riot gear were advancing and attempting to clear the area of rioters, yelling, "Move back." *See* Sentencing Exhibit 1. Several rioters fought and resisted police as they advanced. *See id.* Green—who at one point was right up against the police line—saw officers' efforts to clear the Upper West Terrace and rioters' attempts to resist them. *See* Images 2 through 4 (Sentencing Exhibit 1). Instead of trying to exit the grounds (such as by walking north, away from the police line), Green regrouped with Gruppo and Kelly and followed them into the building.



*Image 2: At around 2:49 p.m., Green (circled yellow) watched officers advance on the Upper West Terrace (Sent'g Ex. 1 at approx. 1:00)*



*Image 3: Green was up against the line as rioters resisted officers' efforts to clear the Upper West Terrace (Sent'g Ex. 1 at approx. 1:11)*



*Image 4: Rather than leave, Green walked towards the building, in front of officers, while filming on her phone (Sent'g Ex. 1 at approx. 1:27)*

At 3:00 p.m., Green, Gruppo, and Kelly entered the Senate Wing door on the northwest side of the U.S. Capitol. As they entered, an alarm was blaring and the glass in the windows next to the door had been smashed out. *See* Sentencing Exhibit 2 at approx. 0:32. Green recorded on her phone as she entered the building. *See* Image 5. At the time, a piece of wooden furniture lay on the floor; the area was also packed with rioters.



*Image 5: Green (yellow, right), behind Gruppo (blue) and Kelly (orange), recording on her phone after she entered the Capitol through the Senate Wing Door at 3:00 p.m.*

Immediately upon entering the Capitol Building, Kelly, Gruppo, and Green turned right and walked south down the hallway toward the Crypt. At about 3:03 p.m., the three returned to the Senate Wing entrance and approached officers near the broken furniture on the floor. As seen in the surveillance footage, one of the USCP officers repeatedly pointed Gruppo toward the Senate Wing door—the same door through which the group had entered. *See* Image 6. Instead of taking this clearly unobstructed exit, Gruppo, Kelly, and Green turned around and walked back towards the Crypt.

6



*Image 6: After a Capitol Police officer pointed to the Senate Wing Door during a conversation with Gruppo (blue), Gruppo, Kelly (orange), and Green (yellow) headed deeper into the building*

Green, Gruppo, and Kelly passed through the Crypt, arriving at the House Wing Door at approximately 3:06 p.m., which at the time was flanked by officers. *See* Image 7. The group walked through the Hall of Columns at approximately 3:07 p.m., with Green lagging behind her two companions in order to record on her phone. Green's delay was significant enough that she had to be directed out of the building by an officer. *See* Image 8.



*Image 7: Green (yellow) followed Gruppo (blue) and Kelly (orange) in the House Wing door at approximately 3:06 p.m.*



*Image 8: Green (yellow), lagging behind Gruppo (blue) and Kelly (orange), is again directed out of the building by an officer in in the Hall of Columns at approximately 3:07 p.m.*

Green left the Capitol through the South Door at approximately 3:07 p.m. *See* Image 9. In total, Green spent approximately 7 minutes inside the U.S. Capitol Building.



*Image 9: Green (yellow) left the Capitol at 3:07 p.m. through the South Door*

*The Charges and Plea Agreement*

On April 1, 2024, the United States charged Green by a two-count Information with violating 40 U.S.C. § 5104(e)(2)(D) and (G). ECF No. 1. On May 30, 2024, pursuant to a plea agreement negotiated pre-charging, Green pleaded guilty to both counts of the Information. By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

*Post-Plea Interview*

Pursuant to the plea agreement, the Government interviewed Green in the presence of her counsel on July 24, 2024. Green admitted that she watched President Trump's speech, that she knew that the purpose of the rally was to "Stop the Steal," and that she followed the former President's instruction to go the Capitol. Green admitted that after climbing the Northwest steps, she saw the line of police officers and understood they were trying to break up the crowd or move it back. But Green falsely claimed that she didn't understand this meant she was not allowed to enter the building. Green also falsely claimed that she was never close to the police line.

9

Green blamed her entrance into the building on following her husband and going with the flow. Though she admitted to seeing the broken glass and hearing the alarm sounding, she persisted in falsely claiming that she did not understand that it was wrong to enter the building. Green claimed that she only began to understand she should not have entered the building when she saw a broken piece of wood on the ground *after* she entered. Green also made the absurd claim that the group were looking for a way to exit the building and that Gruppo had to ask officers multiple times for guidance.[3]

Green admitted having used her phone to record video while inside the Capitol. Green admitted that she deleted this evidence of her criminal conduct at some point after January 6—first pretending it was normal for her to delete photos, but later coming closer to the truth when she admitted that she was motivated by not wanting anything to do with January 6.

### III.     Statutory Penalties

Green now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and (G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000 on each count. The defendant must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545

---

[3] Both Kelly and Gruppo made similar claims in their interviews. Gruppo explained that they did not want to leave through the same entrance through which the mob was streaming in, an explanation that Judge Howell gave "the benefit of the doubt" at his sentencing. *See United States v. Leonard Gruppo*, 21-cr-391 (BAH), Sentencing Hrg. Tr. at 35:23-25 ("A person trying to find a quick and easy safe way out would likely have found another way out than that door; I understand that."). Image 6 above, however, shows that the group appeared to ignore an officer's direction to leave through the Senate Wing Door, and that the path to the Senate Wing Door was relatively clear at the time.

F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Green's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Green, the absence of violent or destructive acts is not a mitigating factor. Had Green engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors is that Green went through the Senate Wing Door despite the ample warning signs: officers in riot gear trying to clear the mob from the Upper West Terrace; a blaring alarm and smashed-out window; broken furniture on the floor; and repeated instructions from officers to leave (both at the Senate Wing Door and later in the Hall of Columns).  Green did all this after hearing former President Trump's call to go to the Capitol, knowing full well that attendees at the "Stop the Steal" rally disagreed with the election outcome.  Green recorded her

11

criminal trespass, but later decided to delete the evidence. And after her decision to plead guilty in this case, Green made false statements to law enforcement about material aspects of her offense—whether she knew officers were trying to stop her from entering the building; whether she was close to those officers; that she did not believe it was wrong to enter the building until after she was already inside; and that that the group was simply looking for a way to exit the building. Green is an adult responsible for making her own choices. While her time in the Capitol was relatively brief (7 minutes), the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Green's History and Characteristics

Green has had a stable upbringing, has no current mental or physical health problems, no substance abuse, higher education, and a stable family situation. In short, nothing about Green's personal characteristics are particularly mitigating. And although she is a mother and has primary physical custody of her young child, she maintains a co-parenting relationship with the child's father, who watches the baby while Green is at work. PSR ¶ 44.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

**D. The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

A sentence of incarceration is necessary to specifically deter Green from future criminal conduct. To her credit, Green accepted responsibility for her conduct early, agreeing to plead guilty before formal charging. But Green's interview with law enforcement strongly suggest that Green does not fully understand why her conduct was wrongful. For instance, Green's claim that she did not think the police were trying to prevent her from entering the Building is nonsensical in light of what she saw—an advancing line calling on rioters to "move back" and rioters resisting them. Her claim that she was not close to the police line is demonstrably false. And Green falsely

13

claimed she had deleted video evidence in the usual course, before admitting more candidly that she did it because she did not want to be associated with the events of January 6. These statements suggest a need for a sentence that will deter Green specifically by placing a meaningful restriction on her liberty. *Cf. United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.").

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[4] This Court must sentence Green based on her own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: her participation in the January 6 riot.

Green has pleaded guilty to both counts of the Information, charging her with disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol in violation of 40 U.S.C. § 5104(e)(2)(D) and parading, demonstrating, or picketing in a Capitol building in

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

violation of 40 U.S.C. § 5104(e)(2)(G).  These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Stephanie and Brandon Miller entered via the window next to the Senate Wing Door at around the same time (2:56 p.m.) as Gruppo and Green's entry. 21-CR-266 (TSC).  The Millers took a similar path through the Crypt and Hall of Columns—similarly backtracking at one point—and spent about 10 minutes inside.  Brandon Miller broadcast statements while inside like "This is our building" and celebrated after the fact his involvement on social media, including threatening that "nothing will change unless we have a revolution /civil war." Stephanie Miller similarly celebrated her involvement in the riot, acknowledging "we're hoping we don't get charges, but we'll proudly take them if so."  After each pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G), this Court sentenced Brandon Miller to 20 days' incarceration and Stephanie Miller to 14 days' incarceration, each with 60 hours community service and $500 restitution.  While Green entered through a door, not a window, and did not make concerning statements on January 6 or on social media, Green did delete evidence and does not acknowledge why her conduct was wrong.

15

Michael McCormick entered the Senate Wing Door at around 2:55 p.m, spending a similar amount of time (8 minutes) in the building in the same areas as Green. 21-cr-710 (TSC). McCormick also took video while inside and also destroyed evidence. This Court sentenced McCormick to 14 days incarceration, a $1,000 fine, and $500 restitution on his plea to 18 U.S.C. § 5104(e)(2)(G). McCormick made concerning statements on the day that Green did not (e.g., "tired of my country being run by criminals" and "we're taking it back") and had prior contact with the criminal justice system, but did not lie to the FBI during his post-plea interview. A similar period of incarceration is appropriate here.

The Government acknowledges that Green's companions—her husband, Leonard Gruppo, and his friend, Kenneth Kelly—both received sentences of home detention on their pleas to 40 U.S.C. § 5104(e)(2)(G). Kelly sent texts after January 6 bragging about rioters entering the Capitol by "breaking in windows," that he had "watered" the "tree of liberty," and that they made Members of Congress hide under their desks. 21-CR-331 (CKK) (D.D.C.). However, Kelly, an emergency room physician, had a significantly mitigating fact: he assisted in identifying and facilitating Gruppo's self-surrender, while accepting responsibility for his own actions. Judge Kollar-Kotelly sentenced Kelly to 2 months' home detention as a condition of 12 months' probation, and $500 restitution. Green has not facilitated other cases as Kelly did, and she also deleted evidence and made false statements during her interview that do not seem to acknowledge that her conduct was wrong. These factors weigh in favor of a sentence of incarceration here.

Gruppo turned himself in after Kelly's urging. Like Green, Gruppo deleted evidence of his participation from his phone, and Gruppo too appeared to make false statements in his post-plea interview. Judge Howell sentenced Gruppo to 3 months home detention, 24 months' probation, a $3,000 fine, and $500 restitution. 21-cr-391 (BAH) (D.D.C.). Judge Howell cited,

*inter alia*, Gruppo's demonstration of genuine remorse for his conduct in connection with sentencing and his history of military service to his country. Sentencing Hrg. Tr. at 33–42. These mitigating factors are not present here, and a sentence of some incarceration is appropriate.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Green must pay $500 in restitution, which reflects in part the role Green played in the riot on January 6.[6]  Plea Agreement at ¶ 11.  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023.  *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.)  Green's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 94.

## VI.     Fine

The defendant's convictions for violations of 40 U.S.C. § 5104(e)(2)(D) and (G) subject her to a statutory maximum fine of $5,000 on each count. *See* 18 U.S.C. § 3571(b). In determining

---

against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

### VII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence accounts for the nature of her offense, promotes respect for the law, and deters future crime by imposing restrictions on Green's liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Michael L. Barclay*
MICHAEL L. BARCLAY
Assistant United States Attorney
New York Reg. No. 5441423
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, DC 20530
Michael.Barclay@usdoj.gov
(202) 252-7669